[No. 29226. Department One. July 18, 1944.]

ALICE ORA THOMPSON, *as Administratrix, Appellant,* v.
JOHN B. STACK *et al., Respondents.*[1]

*John F. McCarthy,* for appellant.

*W. H. Sibbald,* for respondents.

[1]Reported in 150 P. (2d) 387.

GRADY, J.—This action was brought by Alice Ora Thompson, as administratrix of the estate of Mary E. Thompson, deceased, against John B. Stack, John N. Marques and wife, and the First Federal Savings & Loan Association of Longview, to recover possession of lot 9 in block 9 of Wallace addition to the city of Kelso and to quiet the title as against all the defendants, it being alleged in the amended complaint that Stack claimed to be the owner of the property; that Marques and wife were in possession as tenants; and that the association claimed to be the holder of a mortgage upon it given by Stack.

The defendants Marques did not appear in the action and an order of default was entered against them. The answer of defendant Stack, after making certain admissions and denials, alleged that shortly before her death Mary E. Thompson deeded the property to him. The answer of the association, so far as material here, alleged that it accepted a mortgage on the property from Stack to secure a note executed by him. During the trial, the court allowed the defendants to amend their answers so that they might seek reformation of the deed to Stack.

After a trial before the court, a judgment was entered adjudging that the deed to the property held by Stack was valid; that neither the plaintiff nor those claiming by, through, or under her by virtue of her trust as administratrix of the Thompson estate, had any right, title, or interest in it, and ordering a dismissal of the action. The plaintiff has taken an appeal.

As the rights of the association are dependent upon those of Stack, he will be referred to as though he were the only respondent.

This being an equity case the trial court did not make any findings of fact. We find from the record the factual situation to be as follows: Two of the platted portions of the city of Kelso are Wallace addition and Wallace's second addition and they are contiguous. The former is sometimes incorrectly referred to as Wallace's first addition. The blocks in Wallace addition are numbered from one to eleven and those in Wallace's second addition are num-

bered from twelve upwards.  The lots in block 9 are numbered from one to sixteen.

On January 8, 1941, Mary E. Thompson was the owner of lot 9 in block 9 of Wallace addition.  She did not have any other property in that addition, nor did she have any in Wallace's second addition.  On that day, desiring to convey some of her real estate in anticipation of death, she summoned a notary public to her home and gave to him the names of those to whom she desired to convey the property together with a description of each tract.  She informed him that she desired to give lot 9 in block 9 of Wallace addition to respondent, and that it was the corner property. The plat shows that this property is at the southeast corner of block 9 where Fourth street and Elm street intersect.

The notary had been an abstracter for many years, was well acquainted with Mrs. Thompson, and knew the property she had in Kelso and its location.  However, when he prepared the deed for respondent he made a mistake and described the property as "All of Lot Numbered Nine (9) of Block Nine (9) in the Wallace Second Addition to the City of Kelso, as shown by the duly Recorded Plat thereof in the office of the County Auditor.  . . ."

The deed was taken by the notary to Mrs. Thompson and signed and acknowledged by her, and she then delivered it to the respondent.  It was recorded on January 15th, and respondent thereafter gave a mortgage on the property to the association.  Two days after the execution of the deed Mrs. Thompson died.  On January 22nd, the deed came into the possession of the notary and he changed the wording of the description of the land by striking out the word "Second" and inserting the word "First" and gave it to respondent who again caused it to be recorded.

The theory upon which appellant presented her case to the trial court was that, as respondent claimed title by virtue of the deed he received from the grantor and which conveyed property in Wallace's second addition, he was not entitled thereunder to possession of lot 9 in block 9 of Wallace addition, and that it belonged to the estate of Mrs. Thompson; also that the deed was void because it had been

materially altered after its execution without the consent of the grantor. The respondent and the association sought to meet these claims by showing that the grantor intended to convey property in Wallace addition, but, by mistake on the part of the notary who drew the deed, a description was inserted of nonexistent property. The court ruled that this evidence was not admissible in the absence of pleading and prayer for reformation of the deed, and upon application permitted amendments to the answers to tender the issue.

The appellant groups her assignments of error into three main questions: (1) Was there a valid delivery of the deed by the grantor? (2) What effect did the alteration of the deed have upon its validity? (3) Can the deed be reformed?

█ It is the contention of appellant that the delivery of the deed was conditional in that it was not to be effective unless the grantor died as a result of her then illness, and, in the event of recovery, the deed was to be destroyed.

On this branch of the case, Mrs. Mary Brock, a daughter of Mrs. Thompson, testified:

"Q. . . . When this instrument Exhibit A was given to Mr. Stack, what did he do with it, do you know? A. Put it away, I guess. Q. Where did he put it? A. I do not know what he done. Q. Did you see what he did with it? A. No, I did not. Q. At the time it was given to him by your mother, or right after that did your mother or Mr. Stack say anything about the deed? A. Not that I heard. Q. Didn't hear anything? A. No, sir. Q. Was there any statement made by Mr. Stack at that time that in the event that your mother got well, then he would burn it? A. Yes, sir. Q. That statement was made there? A. Yes, sir. Q. That was the understanding, that if she recovered, the deed would be destroyed? A. Yes, sir. . . . Q. When did you hear that conversation? A. When she gave him the deed. Q. If she did recover, the deed would be destroyed? A. Yes, sir."

Mr. Perry, the notary public drawing the instrument, testified as follows:

"Q. Who was there when she signed this instrument? A. Well, her daughter was there. Mrs. Brock was there, I am pretty sure. I am not sure whether Mrs. Westover was

there that afternoon or not. Q. Was Mr. Stack there? A. I think he was around the house, but he was not in the room at the time she signed any of the deeds. He was not in there. Q. What did she do with this deed after she signed it? A. She handed it direct to him. Q. He must have been there when she signed? A. He came in afterwards. I was there quite a while and was talking. Q. What was said there with regard to this deed? A. She said he did so many things for her, she wanted to give him that property; it was kind of run down and was not very much income to it. Q. Was there anything said as to what was to happen in case she recovered from her illness? A. Nothing. Q. Nothing that you heard? A. Nothing that I heard. . . . Q. Was there anything said about the time these deeds were to take effect? A. I did not hear anything about that. Q. Did not say anything about their taking effect after she died? A. I think she handed Mrs. Brock her deed right there. I didn't—there was nothing said about taking effect. Q. Nothing said about taking effect of any of them? A. No."

It will be seen from the testimony that the claim of conditional delivery finds support only in the testimony of the daughter, and it is not only denied by Mr. Perry but also is not sufficient to establish such fact. The grantor did not impose any condition when she handed the deed to the grantee and by her act in so doing title immediately passed to him. Any statement he thereafter made about burning the deed was ineffective. The statement of the witness as to the "understanding" was only her conclusion and no proof of any condition. She was an interested witness and her testimony is overcome by that of Mr. Perry. We find that there was an unconditional delivery of the deed with the intent on the part of the grantor that title then pass to the grantee.

■ On the question of the effect of the claimed alteration of the deed, it is necessary to consider carefully the evidence with reference as to just how the change came to be made by the notary who drew it, because it is of importance whether the change was made by the notary upon the request of the respondent or by the notary of his own volition. The trial judge stated in his memorandum decision that the change had been made at the request of re-

spondent, but after a consideration of the record we are unable to reach the same conclusion. The only witness who testified as to the change was Mr. Perry, the notary, and was as follows:

"Q. I call your attention to the fact that in the description it is apparent that the word 'Second' in the description is erased and the word 'First' is substituted, or is added to it. Who did that? A. I did."

On cross-examination he further testified:

"Q. I understand you testified that you made the changes on this deed, that is, Exhibit A? A. That is right. Q. They were made after the death of Mrs. Thompson? A. I am not sure. I think so. I do not remember the date she died. Q. Well, they were made after the deed had been recorded once? A. That is right. Q. And at whose request did you make those changes? A. I am not sure, that anybody requested it. I know the deed was exhibited to me, and I did change it. It might have been Mr. Stack. Q. It was at his request that you made the change? A. Some one sent the deed up to me, I think, the Title Company or some one, I think. Q. Mr. Stack brought it up? A. I am not sure about that now. Q. What did you do with it after you made the change? A. I do not know whether I brought it up for recording or not. I am not sure. Q. Do you remember who brought the deed to you? A. I cannot remember now. Q. And cannot remember what you did with it after you made the changes? A. I do not think—I was going to put it on record, but Mr. Stack, I think, came and got it. Q. You think Mr. Stack came and got it? A. I am not sure."

We cannot find from the notary's testimony that the change was made at the request of respondent, but believe the proper conclusion to reach is that the title company discovered that the deed purported to convey nonexistent property, realized there must have been a mistake, and sent the deed to the notary and he made the change of his own volition. The respondent may have brought the deed to the notary, but this alone does not prove he requested any change with intent that the deed should be materially altered.

The notary was a stranger to the deed and the change in it of his own volition is regarded as a spoliation and not

an alteration of the instrument. *Murray v. Peterson,* 6 Wash. 418, 33 Pac. 969; *Edwards v. Thompson,* 99 Wash. 188, 169 Pac. 327; 2 Am. Jur., Alteration of Instruments, p. 604, § 11.

In the *Edwards* case, we said, p. 191:

"The ancient rule that any material alteration of a written instrument, even though made by a stranger thereto, avoids such instrument has long since been abandoned; the overwhelming weight of modern authority being to the effect that a change, though material, when made by a stranger, does not avoid the instrument or affect the rights of the parties. Indeed, such change is not regarded as an alteration. In legal contemplation, an alteration of a written instrument consists in the erasure, interlineation, addition or substitution of material matter affecting the identity of such instrument or the rights or obligations of the parties arising therefrom, made by a party thereto, or one entitled thereunder, or one in privity with such person, without the consent of the other party, and after the instrument has been fully executed. Any change made by a stranger to the instrument, without the connivance or consent of the parties, is, strictly speaking, a spoliation. [Citing authorities.]"

The deed, not having been vitiated by the spoliation, stands as a valid instrument in its original form. It purports to convey property that does not exist. The intention of the grantor was to convey specific property owned by her.

Having decided that there was an unconditional delivery of the deed and that it is valid in its original form, the next question is, what final disposition should be made of this case?

◼ The trial court, using *Newman v. Buzard,* 24 Wash. 225, 64 Pac. 139, *Wetzler v. Nichols,* 53 Wash. 285, 101 Pac. 867, 132 Am. St. 1075, and *Konnerup v. Milspaugh,* 70 Wash. 415, 126 Pac. 939, and other authorities as a basis, concluded that parol evidence was admissible to identify the property the grantor intended to convey. The evidence received showed that the only possible property the grantor could have had in mind was lot 9 in block 9 of Wallace addition, and it would follow that in fact was the property conveyed by the deed. The rulings of the trial court on the reception

of the parol evidence and the conclusion reached were correct and are supported by the above-mentioned authorities and what we said in *Maxwell v. Maxwell,* 12 Wn. (2d) 589, 123 P. (2d) 335, at p. 598:

"In the case at bar, we think that the uncertainty or ambiguity in the deed was of the character which may be explained and rectified by resort to parol evidence. Disregarding entirely the testimony of respondent as to what land the parties intended should be conveyed, it clearly appears from other evidence in the record that the ambiguity was due to the two inadvertent errors on the part of the scrivener, and that the correct real property description expressive of the intention of the parties can readily be determined from the instrument itself, considered in the light of the surrounding circumstances and the situation of the parties at the time the deed was executed."

The court felt the facts of the case did not warrant reformation of the deed. It might seem that, when it is held that the grantor did in fact convey the property to the respondent, reformation would not be necessary, but, in the interest of clarity and the stability of the title to the property, we think we should adopt the view expressed in *Edwards v. Thompson, supra,* and order a reformation of the deed. In that case, it was held that, when it was made to appear that the parties to a transaction intended that a mortgage should contain a certain description of land and by a mistake on the part of the one who drew it a part of the property was omitted, the party affected was entitled to have the instrument reformed.

The judgment is affirmed, but the case is remanded to the lower court for the entry of an order directing that the deed be reformed to conform to the views herein expressed.

SIMPSON, C. J., STEINERT, BEALS, and JEFFERS, JJ., concur.